## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| CYNTHIA RUTHRAUFF, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>    *v.*<br><br>LUMINESS DIRECT, LLC,<br><br>        *Defendant*. | Civil Action No. 1:18-cv-00704 |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT LUMINESS DIRECT, LLC'S MOTION TO DISMISS

## I.    INTRODUCTION

This case challenges Defendant Luminess Direct, LLC's ("Defendant" or "Luminess") serial violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). The claims are straightforward: without prior express consent, Luminess spams consumer's cellphones with text messages urging them to buy its cosmetic products. Worse yet, the opt-out mechanism on Defendant's text messaging platform is broken—it fails to honor and process valid "Stop" requests so that Luminess discontinues texting once a consumer opts out. Indeed, rather than receive a "Stop" message from a consumer's phone and cease

the transmission of future texts, Defendant continues to send unsolicited text messages to users in blatant violation of the TCPA.

Plaintiff Cynthia Ruthrauff ("Plaintiff" or "Ruthrauff") is just one of many consumers who tried unsuccessfully to opt-out by responding "Stop" to Defendant's harassing texts. Yet rather than apologize to Ruthrauff, let alone correct its systemic errors, Luminess hides behind an arbitration provision supposedly tucked away in Terms and Conditions of Purchase ("Terms") found on a website located at URL http://www.LuminessAir.com (the "Luminess Website").

Fortunately for Ruthrauff and the members of the alleged Class, Luminess cannot invoke its supposed arbitration agreement against Ruthrauff, who never saw or assented to the terms. That is, Ruthrauff's purchase was made over the phone—not through the Luminess Website—and Ruthrauff never assented to the arbitration clause or even to the Website's Terms more generally. She never saw them because Luminess failed to reasonably notify her of their existence.

Luminess disagrees and asserts that it informed Ruthrauff of the existence of the Terms by: (1) including a short statement about them during one of its television infomercials, (2) supposedly briefly mentioning the Terms on a pre-recorded message a caller hears upon dialing Luminess, and (3) inserting a mention of the Terms in small print on its packing list. Such assertions go nowhere. Put

simply, Ruthrauff and other consumers who made phone purchases were not put on reasonable notice of the Terms so as to empower Luminess with the right to enforce them.

In any event, and assuming solely for the sake of argument that the Court finds that a valid contract to arbitrate was formed, the Terms are unenforceable because they are procedurally and substantively unconscionable. The Terms represent a contract of adhesion that is entirely one-sided and renders arbitration— and the vindication of Plaintiff's rights—nearly impossible. As such, even if the Court concludes an agreement was formed (it wasn't), it should not be enforced.

As such, and as explained further below, Defendant's arguments fall apart, and the Court should deny its Motion to Compel Arbitration.

## II.     FACTUAL BACKGROUND

Defendant Luminess is a cosmetics company. (Compl. ¶ 9.) In or around August 2016, after seeing some portion of a Luminess infomercial, Plaintiff ordered cosmetic products from Luminess over the telephone. (*See* "Declaration of Cynthia Ruthrauff," attached hereto as Exhibit A, ¶ 1.) Nearly a year later, on July 15, 2017, Ruthrauff began receiving text messages from Luminess advertising its

products and other promotions. (Compl. at ¶¶ 24-29.)[1] Ruthrauff responded "Stop"

on numerous occasions, including on July 15, 2017, July 29, 2017, and September

16, 2017. (*Id.* ¶¶ 25-28.) This was to no avail. Luminess ignored Ruthrauff's

"Stop" requests and continued to bombard her with text messages. (*Id.*) As such,

Plaintiff filed the instant action seeking damages and injunctive relief to put an end

to Defendants' continued text messages. (Dkt. 1.)

On March 27, 2018, Luminess filed its Motion to Dismiss. (Dkt. 10.)

Luminess contends that the informercial Plaintiff watched some portion of advised

viewers at some point in the program that Luminess's Website Terms and

Conditions ("Terms") would apply to the television offer and directed viewers to

its website, which allegedly contained the Terms. (Dkt. 10 at 2.) Luminess further

contends that after Ruthrauff purchased products over the phone, Luminess

shipped the products and enclosed a Packing List that referred to the Luminess

Website for the terms and conditions. (*Id.*) The reference to the Website on the

---

[1] Luminess claims that Plaintiff consented to receive text messages from it during
the August 2016 phone call. (Mot. at 2.) Importantly, however, the TCPA requires
prior express **written** consent for telemarketing text messages like the ones at issue
in this case. *See, e.g., Coleman v. Rite Aid of Georgia, Inc.*, 284 F. Supp. 3d 1343,
1347 (N.D. Ga. 2018). Thus, while the issue is not presently before the Court, it is
worth noting that Luminess's oral consent theory is wholly insufficient to support a
prior express consent defense under the TCPA. Luminess's only hope is that the
Court will save it through arbitration.

Packing List is buried all the way at the bottom of page 2 of the List and is in small print. (*See* Dkt. 10-1 at 9.) Finally, Luminess contends that on some subsequent calls initiated by Plaintiff, Plaintiff would have heard some sort of recorded message mentioning the Terms on Luminess's website. (*Id.* at 7.)

As explained more fully below, Luminess cannot show on the present record that an enforceable arbitration agreement was formed and, as such, the Motion should be denied.

## III.   ARGUMENT

It is well settled that "arbitration is a creature of contract." *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000). A court cannot compel parties to arbitrate their dispute in the absence of clear agreement to do so. *See Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). In order "[t]o satisfy itself that such agreement exists," courts must undertake to resolve any issues relating to the formation of the arbitration agreement, *Granite Rock Company v. International Brotherhood of Teamsters*, 561 U.S. 287, 297 (2010).

The Court should deny Luminess's Motion. The Terms that Luminess points to as the basis for compelling arbitration are invalid and unenforceable against Plaintiff Ruthrauff for at least two reasons. First, the Terms were contained on a website that Plaintiff never visited and was never directed to (see Ex. A. ¶¶ 3-5);

rather, the transaction between Plaintiff and Luminess was over the telephone. Vague references to the Terms during a television infomercial and a brief mention of the Terms—but not the arbitration clause—buried in small print on a packing slip are insufficient to constitute mutual assent to arbitrate. Ruthrauff cannot be compelled to arbitrate based on a contract of which she was never made aware.

Second, even if the Court finds that a valid contract was formed, the Terms are procedurally and substantively unconscionable. There is a clear inequality of bargaining power, lack of any negotiation, and one-sided substantive provisions that make arbitration nearly impossible to pursue with the assistance of counsel.

Accordingly, and as explained further below, the Court should deny Luminess's Motion to Dismiss and allow the case to move forward.

### A. Luminess Cannot Rely on the Arbitration Agreement Supposedly Located on its Website—Ruthrauff Never Visited the Website, Was Never Reasonably Apprised of the Website's Terms, and Never Assented to the Arbitration Clause.

Luminess cannot rely on its Terms to force Plaintiff into arbitration here because Ruthrauff never agreed to them. Simply put, no contract to arbitrate was ever formed.

As arbitration is a matter of contract, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,*

473 U.S. 614, 626 (1985); *see also Chastain v. Robinson–Humphrey Co., Inc.,* 957 F.2d 851, 854 (11th Cir. 1992). "A court must first consider 'any formation challenge to the contract containing the arbitration clause,' *Solymar Invs., Ltd. v. Banco Santander S.A.,* 672 F.3d 981, 990 (11th Cir. 2012), because 'a party plainly cannot be bound by an arbitration clause to which it does not consent." *BG Grp., PLC v. Republic of Argentina,* 134 S.Ct. 1198, 1213, 188 L.Ed.2d 220 (2014)'." *Regan v. Stored Value Cards, Inc.*, 85 F. Supp. 3d 1357, 1359 (N.D. Ga. 2015) (citations omitted). "[A] district court considering the making of an agreement to arbitrate should give to the party denying the agreement the benefit of all reasonable doubts and inferences that may arise." *Id.* at 1360.

"To form a valid contract under Georgia law, 'there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate'." *Extremity Healthcare, Inc. v. Access To Care Am., LLC*, 339 Ga. App. 246, 251 (2016). "Thus, unless and until there is the mutual assent of the parties to all essential terms, there is no complete and enforceable contract." *Id.* (citing *TranSouth Financial Corp. v. Rooks*, 269 Ga. App. 321, 323 (2004)). "In determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's

intention is deemed to be that meaning a reasonable person in the position of the other contracting party would ascribe to the first party's manifestations of assent." *Hart v. Hart*, 297 Ga. 709, 711, 777 S.E.2d 431 (2015).

Applied here, Ruthrauff disputes the existence and formation of any contract requiring her to arbitrate her claims against Luminess. (*See* Ex. A ¶¶ 2-6.) She denies ever going to the Website, viewing or agreeing to the Terms, or being advised by a Luminess representative (or any other message) over the phone about the existence of an arbitration agreement. (*Id.*) Brief references to the Terms on a television informercial, a short reference to the Terms buried in fine print on a packing slip which was sent after Plaintiff already made a purchase, and vague references to the Terms supposedly made on a pre-recorded telephone message (with no mention of an arbitration clause) are insufficient to constitute assent to the arbitration clause at issue here.

Indeed, while Luminess attaches the Packing List to its Motion, the only details provided about the infomercial are that "the infomercial advised that Terms and Conditions would apply to the special television offer and directed viewers and would be purchasers to the public Luminess webpage, www.LuminessAir.com, which contained the Terms and Conditions of purchase." (Dkt. 10-1, at ¶ 2-3.) No details are provided to show the manner by which the infomercial advised viewers

about the Terms—*i.e.*, was there an oral statement directing viewers to the website? How often/frequently during the infomercial did this or any similar message appear? Did a written statement appear on screen, buried in hard to read/see print at the bottom? Again, how often and for how long was the message displayed on the screen? It is entirely unclear on the present record how the infomercial supposedly put consumers on notice.

The same in true of Luminess's statement that consumers who call it "receive[] a recorded message which also directs consumers to the Terms and Conditions on the public webpage". (Dkt. 10-1. at ¶ 7.) No details are provided about what the message specifically states, the context within which consumers are directed to the Terms, whether the recorded message advises consumers of the existence of an arbitration clause in the Terms, or whether consumers are notified that continuing with the phone call would constitute agreement to the Terms. Simply put, Luminess hasn't met its burden.

*James v. Glob. Tel*Link Corp.*, a District of New Jersey case in which assent to an arbitration agreement contained on the defendant's website was supposedly obtained over the telephone, is instructive. No. CV 13-4989 (WJM), 2016 WL 589676 (D.N.J. Feb. 11, 2016). As Luminess claims in part here, in *James* consumers were notified over the phone by an automated system that the services

9

the defendant provided were governed by the defendant's terms of use and that the terms could be obtained on the defendant's website. *Id.* at *4. Because consumers were not required to "engage in any affirmative conduct to demonstrate acceptance of the [terms of use]," the *James* court ultimately found that the arbitration agreement was unenforceable. In doing so, the *James* court likened situations where products are purchased over the telephone to internet browsewrap agreements, where 'by merely using the services of ... the website [ ] the user is agreeing to and is bound by the site's terms of service." *Id.* (citing *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012).)

Luminess's supposed contract with Ruthrauff fails for identical reasons. That is, Luminess was required to put Ruthrauff on reasonable notice of the existence of the Terms and, similar to a browsewrap agreement, the infomercial, phone call, and reference to the terms in the packing slip all fall far short of doing so. "Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements. . ." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76  (9th Cir. 2014). Unlike clickwrap agreements, "'[b]rowsewrap agreements are those that purport to bind the users of websites' where 'the text of

the agreement is [generally] located on a separate webpage hyperlinked to the website the user is accessing.'" *Herman v. Seaworld Parks & Entertainment, Inc.*, Case No: 8:14-cv-3028-T-35JSS, 2016 WL 7447555, at *4 (M.D. Fla. Aug. 26, 2016) (citing *AvePoint, Inc. v. Power Tools, Inc*. 981 F. Supp. 2d 496, 510 (W.D. Va. 2013)).

In distinguishing between "clickwrap" and "browsewrap" agreements, the Middle District of Florida has explained that:

> Unlike "clickwrap" agreements, where users are required to click an "I agree" box after being presented with a list of terms and conditions, browsewrap agreements do not require the user explicitly to assent to the terms and conditions of the agreements expressly; a party instead purportedly gives consent simply by using the website. "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the [terms of the] browsewrap agreement or even knowing that such a webpage exists."

*Herman*, 2016 WL 7447555, at *4 (citations omitted). Hence, "'[b]ecause no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on *whether the user has actual or constructive knowledge* of a website's terms and conditions.'" *Id.* (emphasis added).

With respect to actual or constructive knowledge, "[w]here 'there is no evidence that the website user had actual knowledge of the agreement, the validity

of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.'" *Id.* at *5 (citing *Nguyen*, 763 F.3d 1171). Stated simply, "'[b]rowsewrap' agreements have only been enforced when the hyperlink to the terms and conditions is conspicuous enough to place the user on inquiry notice." *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 765 (Fla. Dist. Ct. App. 2017).

In *Herman*, this Court found that a defendant's terms and conditions constituted an unenforceable browsewrap agreement where the hyperlink to the terms and conditions was at the bottom of the page and below the "Continue" button. *Id.* ("[T]he hyperlink is in small-print type at the very bottom of the website and users must, unprompted, undertake to affirmatively scroll to the bottom of the page to see the link."). Further, the Court noted that users could complete their purchases without ever having to see the hyperlink at all. *Id.* ("Moreover, unlike the circumstances in *Nguyen*, a SeaWorld user may complete a purchase of passes on the website without having to bring the hyperlink within his or her line of vision.").

Furthermore, in *James*, the court found that merely notifying a user on a recorded telephone message of the existence of the terms of use and where the terms can be found was insufficient to form a legally enforceable contract where

consumers were not put on notice that "their use would be interpreted as agreement" to the terms. *James*, 2016 WL 589676 at *5-*6. (citing *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 WL 5568706, at *9 (N.D. Cal. Oct. 9, 2013) (stating that because only a link was provided to the terms of use there was no grounds to find that defendants were put on notice that mere use constituted assent); *Holdbrook*, 2015 WL 4476017, at *6 (finding no enforceable contract where "there [was] no statement that signing the agreement indicated acceptance of the 'Terms and Conditions', nor [was] there an instruction to sign the contract only if [offeree] agreed to the additional terms.")); *see also Kraft Real Estate Investments, LLC v. HomeAway.com, Inc.*, No. 4:08-CV-3788-TLW, 2009 WL 10677930, at *2 (D.S.C. May 14, 2009) ('[T]his Court has not discovered[] a case in which a court has enforced terms and conditions of use, based on their mere presence somewhere on a website.)*; cf. Singh v. Uber Techs. Inc.*, 235 F. Supp. 3d 656, 666 (D.N.J. 2017) (finding assent where plaintiff "was **required to review and agree** to the hyperlinked Raiser Agreement that was prominently displayed within the Uber App's Terms and Conditions page".) (emphasis added.)

Applied here, Luminess claims that the informercial Plaintiff viewed advised that its Terms and Conditions would apply to the television offer and directed

views to its website, which allegedly contained the Terms. (Dkt. 10 at 2.)[2]
Luminess further contends that after Ruthrauff purchased products over the phone,
Luminess shipped the products and enclosed a Packing List that mentioned its
Website, which contained the terms and conditions. (*Id.*)[3] Luminess finally claims
that when a consumer calls it, the consumer hears a recorded message directing
consumers to the Terms. (*Id.*) None of this is sufficient to put a reasonably prudent
user on notice of the Terms and the arbitration clause. Similar to the situations in
*Herman* and *James*, consumers like Ruthrauff who call Luminess to order products
after seeing an infomercial may complete their orders without having to
affirmatively agree to the Terms or in fact to ever view them. Indeed, Luminess
doesn't claim that consumers were required to affirmatively agree to its Terms—
Luminess claims merely that the "Terms and Conditions on the public webpage
and **referenced** in the informercial, Packing List, and prompts when calling
Luminess govern . . ." (Dkt. 10-1. at ¶ 10.) Referencing the Terms and requiring
consumers to affirmatively assent to the Terms are different matters.

---

[2] Again, Luminess presents no evidence of the manner by which the Terms were
presented on the infomercials. At this point it could have been briefly mentioned in
a single passing instance—Luminess hasn't met its burden of showing an
agreement to arbitrate.

[3] The reference to the Website on the Packing List is buried all the way at the
bottom of page 2 of the List and is in fine print. (*See* Dkt. 10-1 at 9.)

And Luminess's reliance on the Packing List is even more attenuated—receiving a document after already making a purchase with language buried in small print state that Terms can be found online does not manifest assent to the Terms. Indeed, it is telling that Luminess could've included the arbitration agreement in the terms that accompanied the Packing List terms but chose instead to include a barely legible reference to the website Terms more generally—without mentioning arbitration at all.

In short, the Court should follow the decisions in *James* and *Herman* and deny the Motion to Dismiss.

### B.     The Agreement is Procedurally and Substantively Unconscionable in Any Case.

Even if the Court were to find that a valid contract was formed, the arbitration agreement set forth in the Terms is unenforceable because it is procedurally and substantively unconscionable.

An arbitration agreement is susceptible to the same contract defenses as any other contract. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). One potent contractual defense is unconscionability. "[T]he basic test for determining unconscionability is 'whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing

at the time of the making of the contract'." *NEC Techs., Inc. v. Nelson,* 267 Ga. 390, 478 S.E.2d 769, 771 (1996) (quoting U.C.C. § 2–302 cmt. 1). Georgia law recognizes both procedural and substantive unconscionability. *Id.* "Most courts take a "balancing approach" to the unconscionability question, and to tip the scales in favor of unconscionability, most courts seem to require a certain quantum of procedural plus a certain quantum of substantive unconscionability." *Id.* at 773.

As explained below, Luminess's Terms suffer from fatal doses of both procedural and substantive unconscionability.

### 1. Luminess's so-called presentation of the Agreement was procedurally unconscionable.

"[P]rocedural unconscionability address the process of making a contract." *Dale v. Comcast Corp.*, 498 F.3d 1216, 1219 (11th Cir. 2007). "A non-inclusive list of some factors courts have considered in determining whether a contract is procedurally unconscionable includes the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *NEC Techs., Inc.*, 478 S.E.2d at 771-72.

Applied here, Luminess's Terms are supposedly referenced in passing during a television infomercial (again, it is unclear how or how often) and are then

briefly mentioned in the fine print of a Packing List after a purchase has already been made. Consumers do not need to affirmatively assent to the Terms before making a purchase, are not alerted to their existence during purchase calls, and never need to view the Terms—yet, supposedly, they're bound by them. This amounts to unfair surprise. Furthermore, Ruthrauff, a layperson, had no bargaining power and no opportunity to negotiate the terms this contract—with the agreement hidden such that she was completely unaware of its existence, how could she?

In short, Luminess's Terms bear all the hallmarks of a procedurally unconscionable contract.

### 2.   The Terms are also substantively unconscionable.

The Terms are also substantively unconscionable. "To determine substantive unconscionability, courts focus on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Dale*, 498 F.3d at 1219.

Though the Agreement is primarily unconscionable for its oppressive, adhesive, and surprising nature, it also unreasonably favors Luminess. Indeed, any attempt to analogize this case to the arbitration agreement at issue in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) fails. In that case, AT&T's arbitration agreement was laden with consumer-friendly incentives that made

arbitration a more-even playing field. For example, AT&T's arbitration agreement was objectively favorable to consumers with valid claims, specifying that: (1) AT&T had no ability to seek reimbursement of its attorney's fees, and (2) in the event that a consumer received an arbitration award greater than AT&T's last written settlement offer, AT&T would pay a $7,500 minimum recovery and twice the amount of the consumer's attorney's fees. *Concepcion*, 131 S. Ct. at 1744. Such provisions were deemed sufficient in the eyes of the Supreme Court to incentivize attorneys to assist AT&T's customers in vindicating their rights. *Id.* at 1753 (approving the district court's finding that "the scheme [is] sufficient to provide incentive for the individual prosecution of meritorious claims that are not immediately settled" and the Ninth Circuit's finding that consumers who filed claims would be "essentially guaranteed" to be made whole.) The Supreme Court agreed with the District Court that consumers would be better off arbitrating than proceeding as part of a class action.

In stark contrast here, Luminess's Terms contain barely any of the consumer-friendly provisions found in *Concepcion*. Unlike *Concepcion*, there is little incentive to actually proceed with arbitration—allowing Luminess to escape being held accountable for its conduct. Indeed, there is no incentive in Luminess's agreement for attorneys to take on cases—attorneys' fees are not recoverable and

Luminess will only cover the cost of arbitration if an arbitrator determines that the claim is non-frivolous based on no defined criteria. Put simply, Luminess's dispute resolution provisions are damaging to consumers and the Court should refuse to compel arbitration.

As a final point, while Luminess's arbitration clause ostensibly offers consumers the opportunity to opt-out, this provision is also stacked against consumers. That is, consumers must opt-out within 30 days "of purchase, use, or attempted use of a Luminess Direct Product"—this means that the 30-day clock is triggered anytime a consumer samples (or indeed makes any attempt to sample) one of Luminess's products at a retail store or at a friend's home. This is unreasonably one-sided and strips consumers of any meaningful opportunity to opt-out. Moreover, it also means that consumers are at the whim of the postal service—if an item takes two weeks to ship, even assuming the consumer saw the reference to the Terms on the second page of the packing slip and visited the website immediately they would only have another two weeks to opt-out.

Accordingly, the Court should decline to dismiss on arbitration grounds due to the substantively unconscionable nature of the agreement as well.

## IV.    CONCLUSION

Defendant's Motion to Dismiss should be denied. No contract was ever formed. And even if, assuming *arguendo* that the Court finds otherwise, the contract is both procedurally and substantively unconscionable.

Dated: April 24, 2018                     Respectfully submitted,

                                          **CYNTHIA RUTHRAUFF,** individually
                                          and on behalf of all others similarly situated,


                                          By:   s/ Patrick H. Peluso
                                          One of Plaintiff's Attorneys

                                          Jennifer Auer Jordan
                                          Georgia Bar Number: 027857
                                          (jordan@ssjwlaw.com)
                                          Shamp Speed Jordan Woodward LLC
                                          1718 Peachtree Street NW, Suite 660
                                          Atlanta, Georgia 30309
                                          Tel: 404-893-9400

                                          Steven L. Woodrow
                                          (swoodrow@woodrowpeluso.com)*
                                          Patrick H. Peluso
                                          (ppeluso@woodrowpeluso.com)*
                                          Woodrow & Peluso, LLC
                                          3900 East Mexico Ave., Suite 300
                                          Denver, Colorado 80210
                                          Telephone: (720) 213-0675
                                          Facsimile: (303) 927-0809
                                          *Counsel for Plaintiff and the Putative Classes*

                                          *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2018, I served the above and foregoing papers by causing a true and accurate copy of such paper to be filed with the Clerk of the Court and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.


      /s/  Patrick H. Peluso

## **LOCAL RULE 5.1 CERTIFICATION**

I hereby certify that on April 24, 2018, I filed the above and foregoing papers with the Clerk of the Court and that such paper complies with Local Rule 5.1 and was prepared using a typeface of 14 points in Times New Roman.

/s/ Patrick H. Peluso